[Civil No. 738. Filed March 26, 1904.]
[76 Pac. 598.]

MARTIN GOULD, Plaintiff and Appellant, v. THE MARICOPA CANAL COMPANY, a Corporation, Defendant and Appellee.

1. WATER AND WATER-RIGHTS—CORPORATIONS—CANAL COMPANY—ARTICLES—PURPOSE—PUBLIC AGENCY.—Where a corporation was organized "to carry on . . . the business of supplying a portion" of a

valley "with water for irrigation . . . and to this end and for this purpose to purchase, construct, build or dig such canals, ditches or flumes as may be necessary to convey water . . . to such point or points as may be necessary," its articles do not express that its purpose was to serve its shareholders as a carrier of water and not the public generally. A purpose to become a public agency might reasonably be inferred from the language used.

2. SAME—CANAL—CARRIER—PUBLIC AGENCY.—A corporation was organized in 1875 to carry on and conduct the business of supplying a portion of Salt River Valley with water for irrigation purposes. From the date of its organization until 1880 it supplied any and all landowners under the flow of its canal who applied for such service, indiscriminately. The incorporators of the company, as well as later stockholders, regarded the ownership of a share of stock as carrying with it the right to have delivered, upon any lands the owner might designate from year to year, water sufficient to irrigate one hundred and sixty acres of land. After 1880 and until 1885 the company distinguished between its shareholders and other consumers of water in fixing its rates of toll for service. Subsequent to 1885 the company furnished water to its shareholders and to the lessees of shares of stock, whether appropriators or not, upon any land or lands which such shareholders or lessees might designate, and declined to furnish water to persons not shareholders or the lessees of so-called water-right deeds. *Held,* that the corporation from the time of its organization has been a public agency as a carrier of water.

3. SAME—WATER—PUBLIC—FLOWING IN CANAL OF CARRIER—SUBJECT TO APPROPRIATION.—Water diverted and carried in the canal of a corporation acting as a public agency as a carrier of water is public property until actually used by appropriators, and is subject to appropriation to the same extent and in the same manner as when it flowed in the channel of the river.

4. SAME—APPROPRIATION—WHAT CONSTITUTES—OWNERSHIP OF MEANS OF DIVERSION—UNNECESSARY.—Under the Arizona statutes, an appropriator of water for irrigation is one who makes an application of public water on land he owns or possesses. To perfect such an appropriation two things are essential—the ownership or possession of land, and the application thereon of public water to a beneficial use. No statute, either territorial or congressional, makes the ownership of the means of diversion essential to perfect the right of appropriation.

5. SAME—CANAL COMPANY—NOT OWNER OR POSSESSOR OF LAND—NOT APPROPRIATOR.—A canal company organized for the purpose of the diversion and carriage of water for irrigation, and not being the owner of arable and irrigable land, is not an appropriator of water even though it does divert and carry water.

6. SAME—APPROPRIATORS—WHO ARE—PRIORITY.—Where a company not the owner of arable and irrigable land was organized for the purpose of the diversion and carriage of water for irrigation, all persons owning lands under the flow of its canal, which have been irrigated by means of water furnished by such canal, become appropriators and possessed of rights of appropriation in the order of their priority.

7. SAME—APPROPRIATION—ABANDONMENT—WHAT CONSTITUTES.—Abandonment of the right to water gained by appropriation is a matter of intent as such intent may be evidenced by the declaration of the party or as may be fairly inferred from his acts.

8. SAME—SAME—HOW LOST.—The right of appropriation may be lost by abandonment, or it may be lost to another by adverse user on the part of the other, continued for the period of the statute of limitations, and in no other way.

9. SAME—SAME—ABANDONMENT—DISCONTINUANCE OF USE OF CERTAIN DITCH—DOES NOT NECESSARILY CONSTITUTE.—The discontinuance of the use of a ditch rendered useless as a carrier of water by reason of increased diversions from the stream does not constitute an abandonment of the right of appropriation by an appropriator of water for purposes of irrigation, where it appears that he thereafter continued the use of water by means of another ditch.

10. SAME—CORPORATIONS—CANAL COMPANY—CONTRACT FOR SERVICE OF WATER.—Where a canal company, organized to divert and carry water as a carrier of public water for irrigation, required a user of water, at the beginning of each irrigating season, and as a condition upon which he could receive water, to sign a contract stipulating, in effect, that his use of water from the company's canal for such season should give him no right or claim to the use of water for the future, and that he waived thereby any and all right which he might have by virtue of any statute, custom, or law, to the use of water from the canal after the expiration of the period of time limited by the contract,—such contract is of no effect in lessening the liability of the canal company or the rights of the user as an appropriator of water.

11. SAME—WATER-RIGHTS—CORPORATIONS — CANAL COMPANY — QUASI-PUBLIC SERVANT — DUTY — SERVICE.—A canal company diverting water from a stream for the purpose of supplying owners and possessors of arable and irrigable land is a quasi-public servant; and to the extent that it has diverted and carried water from a stream, and to the extent to which the water has been applied by appropriators for the necessary irrigation of their lands, may not arbitrarily discontinue its service in whole or in part, but must continue this service so long as it is required by said appropriators and the water is available from the common source.

12. SAME—CANAL COMPANIES—CONTRACTS TO FURNISH WATER.—If applications for water be made during any season to a canal company acting as a carrier in excess of the capacity of the canal the company has the right and it is its duty to limit the contracts for the season to its capacity and to those appropriators possessing the older rights of appropriation.

APPEAL from a judgment of the District Court of the Third Judicial District in and for the County of Maricopa. Webster Street, Judge. Reversed.

On rehearing. Memorandum decision, *ante,* p. 111.

Docketed and dismissed with costs. 195 U. S. 639, 49 L. Ed. 356.

The facts are stated in the opinion.

W. H. Stilwell, and Joseph H. Kibbey, for Appellant.

It clearly appears that water diverted from the Salt River through the Wilson Ditch was first applied to reclamation of appellant's land in 1873, and later and "for over ten years last past" the water has been applied through the canal of appellee. The fact that appellant submitted to the illegal management of the canal of appellee does not change the legal status of appellant. The facts are not disputed, and the conclusion in law is irresistible that appellant is an appropriator of water from the Salt River: first by means of the Wilson Ditch, and afterwards, and now, through the Maricopa Canal, acting, as it is, in law, as the agent of the appropriator. *Farmers' High Line Canal etc. Co.* v. *Southworth,* 13 Colo. 111, 21 Pac. 1028, 4 L. R. A. 767; *Wheeler* v. *Northern Colorado Irr. Co.,* 10 Colo. 582, 3 Am. St. Rep. 603, 17 Pac. 487; *Albuquerque Land and Irr. Co.* v. *Gutierrez,* 10 N. Mex. 177, 61 Pac. 357; *Combs* v. *Agricultural Ditch Co.,* 17 Colo. 146, 31 Am. St. Rep. 275, 28 Pac. 966; *Broder* v. *Water Co.,* 101 U. S. 274, 25 L. Ed. 790; *Armstrong* v. *Larimer County Ditch Co.,* 1 Colo. App. 49, 27 Pac. 235; *Golden Canal Co.* v. *Bright,* 8 Colo. 144, 6 Pac. 142; *San Diego etc. Co.* v. *Sharp,* 97 Fed. 394, 38 C. C. A. 220; *Wright* v. *Platte Valley Irr. Co.,* 27 Colo. 322, 61 Pac. 603; *Mandell* v. *San Diego etc. Co.,* 89 Fed. 295; *South Boulder and R. C. D. Co.* v. *Marfell,* 15 Colo. 302, 25 Pac. 504; *Paige* v. *Rocky Ford Canal and Irr. Co.,* 83 Cal.

84, 21 Pac. 1102, 23 Pac. 875; *Curtis* v. *Le Grande Water Co.,* 20 Or. 34, 23 Pac. 808, 25 Pac. 378, 10 L. R. A. 484.

C. F. Ainsworth, for Appellee.

Appellant has lost by abandonment any rights of appropriation he may ever have had. According to the authorities, any right that he may originally have had must be considered as abandoned after this lapse of time, and certainly that is the reason of the matter, for it is now many years since any water has been obtained under the old ditch, and during all that time the appellant has been buying water through the appellee's canal on water-rights rented by him. *Churchill* v. *Bauman,* 104 Cal. 369, 36 Pac. 93, 38 Pac. 43; *Dalton* v. *Rentaria,* 2 Ariz. 275, 15 Pac. 37; *Oppenlander* v. *Left-Hand Ditch Co.,* 18 Colo. 142, 31 Pac. 855; *Davis* v. *Gale,* 32 Cal. 27, 91 Am. Dec. 554; *Hewitt* v. *Story,* 51 Fed. Rep. 101.

Therefore as to this question, Is the appellant entitled to water as a prior appropriator? we see that, as a matter of fact, the appellee is a prior appropriator of all the water that it carries, that, if the appellant or his predecessors in interest ever appropriated any water, which water was taken from him, it was not so taken from him by means of the appellee's canal at all, or certainly, if at all, only in part, and appellee should not be compelled to furnish to him all that was taken, and that the authorities are clear that as the appellant has for many years acquiesced in the rights of the appellee and bought water from it by virtue of water-rights which he had bought or leased, he has abandoned whatever rights he may ever have had, and now has no rights whatever as an appropriator.

Appellee is not bound to deliver water to appellant as claimed by him because he is cultivating lands cultivated earlier than those of water-right owners and lessors. We now come to what we consider really the most important question involved in this case.

This is the question whether the appellee is bound to deliver water to the appellant because he is cultivating lands cultivated earlier than those of some of the lessees of the appellant's water-right owners, notwithstanding that all of the water carried by the appellant is actually being put to a beneficial use by such water-right owners and lessees.

We shall follow out the principle on which the doctrine of appropriation of water and owning of water-rights is based, citing the authorities on the subject, and showing that water-rights need not be inseparably attached to land, that, on the contrary, they are the subject of property and may be bought and leased, and that the right and duty of the canal company is to furnish water to the owners or lessees of water-rights prior to those not owning or leasing water-rights, no matter on what land the water is to be used, provided all its water is actually put to a beneficial use.

The primary reason lying at the foundation of the whole system of the law of water-rights as built up in the arid region of the United States is that the development of the country is first to be considered, or, as the maxim puts it, "The greatest good to the greatest number." The old doctrine of riparian rights would have been injurious in application, as the water was needed to be carried from the streams for use in mining and irrigating the desert lands. Therefore by the application of the principle "the greatest good to the greatest number" the doctrine of allowing the diversion of water for irrigation and other beneficial purposes grew up. Black's Pomeroy on Waters, par. 14.

The next reason that it was found necessary to apply was *qui prior est tempore potior est in jure,* he who was the first appropriator was maintained in his right, for there would have been no stability to the law if an appropriation had not given a fixed legal right. Id.

Having this rule of prior appropriation fixed, the courts looked around for the principles which should govern cases which arose under it; when an appropriation should be recognized, and how the water should be used. Two rules were applied, and these two rules have governed the decision of all well-considered cases on this subject. These rules were (1) that of "beneficial use"; an appropriation could not be made except for a beneficial use, an appropriation not for a beneficial use would not have aided the development of the country; (2) that the possessor of prior rights must so use his rights as not to injure others, or, as the old maxim of the law puts it, *sic utere tuo ut alienum non laedas.*

These simple rules and principles should govern all cases involving water-rights; and we will trace their growth through

the authorities and show how the law has been developed into the principles maintained by the appellee in the present case.

We start with the doctrine of the right of the prior appropriator, and we shall point out how the authorities have reasoned in accordance with the principles above set forth: (a) That an appropriator can change the point of diversion of his water; (b) that an appropriator can change the use to which he puts his water; (c) that an appropriator can sell his water-right and the right will attach to the vendee (not the vendee's land); (d) that a water-right is property and not appurtenant to land unless expressly so made, and that an appropriator can lease his water-right and the water can then be used by the lessee. And, to sum up, that a water-right is property and that a water-right owner or his assignee is entitled to his property in the water, so long as it is actually and beneficially used, before outsiders can have any claim.

(a) Point of diversion can be changed. Soon after the doctrine of prior appropriation had been settled the question arose whether one who had acquired the prior right could not change the point from which he diverted his water if he chose and take the same amount from some other part of the stream. This contention was combated, but the courts held that if the waters were to be applied to a beneficial use, and if by change of the point of diversion no injury was done to the rights of others which had vested since the first appropriation, then there was no reason why the point of diversion should not be changed, and held that it could be. *Ramelli* v. *Irish*, 96 Cal. 214, 31 Pac. 41. " . . . it is also settled law that the person entitled to the use of the water may change the place of diversion, or the use to which it was first applied, if others are not injured by such change."

Other cases to the same point are: *Kidd* v. *Laird*, 15 Cal. 161, 76 Am. Dec. 472; *Whittier* v. *Cocheco Mfg. Co.*, 9 N. H. 454, 32 Am. Dec. 382; *Davis* v. *Gale*, 32 Cal. 27, 91 Am. Dec. 554; *Gallagher* v. *Montecito Co.*, 101 Cal. 242, 35 Pac. 770; *Junkans* v. *Bergin*, 67 Cal. 267, 7 Pac. 684; *Correa* v. *Frietas*, 42 Cal. 339; *Fuller* v. *Swan Co.*, 12 Colo. 12, 19 Pac. 836; *San Luis Water Co.* v. *Estrada*, 117 Cal. 168, 48 Pac. 1075; *Mining Co.* v. *Mosgan*, 19 Cal. 609; *Maeris* v. *Bicknell*, 7 Cal. 262, 68 Am. Dec. 257; *Sieper* v. *Frink*, 7 Colo. 148, 2 Pac. 901.

This idea therefore that the point of diversion of the water could be changed at the will of the prior appropriator provided the water was still put to a beneficial use and that he did not injure others by making the change, became well established in the law, and along with it grew the idea that the (b) use of water can be changed. Following out the reason of the matter, that the right to water acquired by the prior appropriator was a property right belonging to him personally and not to his land, and could be used as he saw fit, provided he did not injure the public by wasting the water, or private individuals by direct harm to them, the courts held that the use to which the water had been first put might be abandoned by the appropriator and the water put to a new use. Kinney on Irrigation, p. 236.

"It will be seen upon examination that the authorities hold conclusively that in all cases the effect of the change upon the rights of others is the controlling consideration, and that in the absence of injurious consequences to others, any change which the party chooses to make is legal and proper, either as to the place of using the water or the use of the water. In fact this is also the common-law rule upon the subject. So if the original appropriation was made to run a saw-mill, the water may be used to run a grist-mill, for mining, irrigating or for some other useful purpose and the appropriator will lose no right that he may have acquired by virtue of his appropriation, so long as he injures the rights of no one else acquired prior to the change."

Other cases to the same effect are: *Ramelli* v. *Irish*, 96 Cal. 214, 31 Pac. 41; *Kidd* v. *Laird*, 15 Cal. 161, 76 Am. Dec. 472: *Maeris* v. *Bicknell*, 7 Cal. 262, 68 Am. Dec. 257; *Meagher* v. *Hardenbrook*, 11 Mont. 385, 28 Pac. 451; *Power* v. *Switzer*, 21 Mont. 523, 55 Pac. 35; *McDonald* v. *Bear River Co.*, 13 Cal. 220; *Davis* v. *Gale*, 32 Cal. 27, 91 Am. Dec. 554.

Now, having followed the reasoning of the court along thus far and having seen that the principles which govern the decision of these water-right cases are simply that the prior appropriator has the right to the water subject only to the proviso that he shall not injure the public by wasting it, or a private individual by violating any of his subsequently acquired rights, we can follow the decisions of the courts a step farther to the proposition that (c) a water-right may be sold

and its prior right be transferred. Cases arose in which the prior appropriator had sold his right to water to some one who was using the water; the right of the assignee was now contested by some third party, and so the court had to consider the validity of the assignment of the water-right.

In deciding this question they found that by holding the assignment valid the public was not injured because the water was actually used, so they held, that in case no individual who had acquired rights subsequently was injured, such a transfer was valid and vested the prior right in the assignee. Black's Pomeroy on Waters, par. 61 (citing *Strickler* v. *Colorado Springs,* 16 Colo. 61, 25 Am. St. Rep. 245, 21 Pac. 316).

"It is also held that the right acquired by a prior appropriator, to use the water of a stream for irrigation, is not inseparably connected with the land for the benefit of which the appropriation was made, but the right may be sold separate and apart from the land; for instance, it may be sold to a city for the use of its inhabitants. *Strickler* v. *Colorado Springs,* 16 Colo. 61, 25 Am. St. Rep. 245, 26 Pac. 313. In the case cited the court in Colorado derived this doctrine from the principle (now well settled by the judicial decisions in that and other states), that one who has acquired the right, by prior appropriation to divert the waters of a stream may change the place of diversion and also the place of use, according to his necessity or interest, provided only that such change involves no injurious consequences to the rights of others. . . . These principles being taken as established it follows as a logical necessity that the right to the use of the water for irrigation is a right not so inseparably connected with the land that it may not be separated therefrom. The right has been treated and held as a property right in numerous cases. (Quoting now from the Strickland decision.) The authorities seem to concur in the conclusion that the priority to the use of water is a property right. To limit its transfer would in many cases destroy much of its value. . . . In our opinion this right may be transferred by sale so long as the rights of others, as in this case, are not injuriously affected thereby. If the priority to the use of water for agricultural purposes is a right of property, then the right to sell it is as essential and sacred as the right to possess and use. What difference can it make to others whether the owner of the priority

in this case uses it upon his own land, or sells it to others to be used upon their lands? There can be no claim of waste. . . . At common law water-rights were declared to be the subject of sale, and although with us such rights are acquired by appropriation rather than by grant or prescription, as at common law, this certainly cannot affect the right of alienation. Citing Angell on Watercourses, c. 5; *Hurd* v. *Curtis*, 7 Met. 94; *DeWitt* v. *Harvey*, 4 Gray, 486. . . . There is no controversy in the present case in reference to the mode and manner in which the right to water may be conveyed, the contention extending further back; the claim being that the right cannot be conveyed at all, except with the land. The claim is not well founded. As we have seen, the right is the subject of property, and may be transferred accordingly; the sole limitation being that the rights of others shall not be injuriously affected by such transfer."

The water belongs to the first appropriator and he can use it as he sees fit or sell it to others to use. The only restriction placed upon him is that he must not injure others whose rights have already vested by his use, or injure the public by waste of the water without use. Kinney on Irrigation, p. 424.

"The exclusive right to divert and use the water of a natural stream acquired by a prior appropriator of the same is the subject of property and may be sold and conveyed." *Ortman* v. *Dixon*, 13 Cal. 33; *Fabian* v. *Collins*, 2 Mont. 510.

The recent case of *Milheiser* v. *Long*, 10 N. M. 99, 61 Pac. 111, recognizes the principle that a water-right may be sold and conveyed, saying: "That the use of water held by virtue of a valid prior appropriation is the subject of sale and conveyance is undoubtedly true." In that case, however, no valid appropriation had been made of the water, because while the water had been diverted it had never been put to a beneficial use. (d) Water-right is property, and not appurtenant to land unless expressly so made, and an appropriator can lease his water-right and the water can then be used by the lessee.

To sum up these authorities we come to the conclusion that the right to water gained by prior appropriation is a right attaching to the appropriator personally and for his benefit. It is a right in gross, so to speak. It is not a right that attaches only to one piece of land. It attaches to the person of the appropriator and for his benefit and profit. He can

use it in any way that he pleases and change the use at any time, provided that he does not injure the public by letting it be wasted or injure parties who have subsequently vested rights. The gist of the matter is that the prior appropriator can do with the right as will most profit him, provided the water is actually used beneficially. It is a property right. *Nichols* v. *McIntosh,* 19 Colo. 22, 34 Pac. 279.

"The law is well settled in this state that a person who has lawfully appropriated water to beneficial use may change the point of diversion without losing his right of priority. A change of water-way does not necessarily involve a change of water-rights. In acquiring a priority of right to the use of water for purposes of irrigation, the mode of diversion is unimportant; and such rights are entitled to be protected, irrespective of the mode of diversion. . . . The late Chief Justice Beck, speaking for the court, declared: 'Property rights in water are as important, as valuable, and as extensive as the broad acres to be fertilized thereby.' . . . Since that time this court has repeatedly held that priorities of right to the use of water are property rights. Such is the settled doctrine of this state." *Bloom* v. *West,* 3 Colo. App. 212, 32 Pac. 846.

"According to the recent legal decisions, a party who owns land, and the right to use water from an irrigating ditch or canal, has two separate and distinct rights of property, either of which could pass by assignment or conveyance, regardless of the other." See, also, the cases cited before.

Now it may be urged, though these cases do hold that a prior appropriator of water holds his right to the use of that water as his own property, and not as appurtenant to his land, and that he can sell or dispose of his right as he wishes, provided that the water is put to a beneficial use; still these cases were all cases where the very individual who had appropriated the water sold his right; whereas, in the case at bar there are intermediate parties between the appropriator and the grantee, the actual user of the water. The actual appropriator might, according to the authorities, have transferred his right to the party who now wants to use the water, but he did not; he transferred it to the corporation, which transferred it to one of its stockholders, who now leases it or sells it to the party who wants to use the water; and this is not lawful. Such a contention would be as absurd as was the

reasoning of the English courts, when they held, in order to evade the statute of uses, that that statute did not apply to a use limited on a use. Such a construction would be absurd, but it is the only difference between the cases cited and the present case. But such construction has not been upheld. In a recent Colorado case almost on all fours with the present case, the court gave the rational idea of the law. That was the case of *Larimer & Weld Co.* v. *Cache La Poudre Co.*, 8 Colo. App. 237, 45 Pac. 525.

In this case the facts were: (1) Some parties owned a ditch and prior rights to water as tenants in common and were consumers of the water thereby carried; (2) they organized a corporation to which they conveyed the ditch and water-rights, the company issuing to the several owners capital stock representing ownership in the ditch, and the quantity of water which they were entitled to use. There were twenty-four shares of stock so issued. (3) Of these twenty-four shares, another corporation, the defendant, long after the water had been beneficially used, bought three and one fourth shares from three of the water consumers and shareholders in the first water company. (4) This second company "stored the water thereby represented in its reservoir, and thence distributed it during the later irrigation season to its stockholders, who used it for irrigating lands belonging to them; and lying under their ditch. It will be seen that the water was thus severed from the land on which it was originally used, and applied for the purpose of irrigating other lands." The plaintiff company was a subsequent appropriator to the parties above mentioned, but now claimed that the defendant had no right to this water thus transferred to it by the first water company, (a) because the grantors of plaintiff had abandoned their rights, (b) because such company had no right to sell its water-rights.

The court below upheld these contentions, and plaintiff in error appealed. The appellate court reversed the lower court, saying in part: "The latter (the rights to water of the grantors of the plaintiff in error) had never been abandoned as alleged, and such fact was established by uncontradicted testimony; and, as shown by all the evidence upon that point, all the water drawn by the Dry Creek Ditch, during the irrigating season, was used upon the land under it, and at

times the supply was inadequate. It is true that all the water represented by the Alvord stock (Alvord was one of the grantors of plaintiff in error) was not used upon his land, but the evidence shows it, when not needed by him, to have been leased or let and used by others under his ownership and control. Such want of personal use, under numerous decisions, has been held not to impair his right of property. If Dry Creek Ditch was entitled to its priority, which is unquestioned, and Alvord was entitled to a given quantity of such priority, and such water was legitimately used upon the land under the ditch, whether applied in person, or rented to others was a question that could in no way affect the legal rights of defendant in error. It is now the settled law that water-rights, though primarily applied to a certain tract of land, may be severed from it, used on other land by the owner, or be sold to any consumer under the same ditch, or the ditch extended to apply the same water-right to other lands or uses, subject only to the limitation that the use and transfer shall not be injurious to a later appropriator. Consequently the diversion and new application of the water were questions in which the defendant in error had no concern, or legal right to interfere, unless clearly establishing the fact of the injury to its supply, which was not established. . . . We are clearly of the opinion that under the law and the evidence . . . the owner (of the stock) had full legal right to connect the Dry Creek Ditch with the reservoir, and carry all the water represented by the stock into it and from it, by any route available to carry it, and apply it to any land for the purpose of irrigation, and that the court erred in its decree." *Cache La Poudre Co.* v. *Larimer & Weld Co.,* 25 Colo. 144, 71 Am. St. Rep. 123, 53 Pac. 318.

This case was now appealed to the supreme court of Colorado, from the decision of the court of appeals, which is cited above, and the decision of the court of appeals was affirmed. The court said: "Notwithstanding the decision of this court in *Strickler* v. *Colorado Springs,* 16 Colo. 61, 25 Am. St. Rep. 245, 26 Pac. 313, that there may be a sale of a water-right, separate from the land, and an application of the water to other lands so long as the rights of others are not infringed, plaintiff persists, that its conclusion is unsound. . . . But not only in this state, but in all others in which the system of

appropriation prevails, the same result has been reached where the question has been raised. . . . The only question of importance then in this case is, Have the transfer of the priority and the change of the place of use injuriously affected the later appropriator? If not, plaintiff may not be heard to complain. . . . They (the prior appropriators) could not waste it (the water appropriated) or divert more than their necessities required; but junior appropriators are not concerned with the method of apportionment adopted by those entitled to its use, so long as the latter had a necessity for it, and actually used it, and diverted no more than the decreed priority. If one consumer did not need or use all that his stock entitled him to, or if, by sale of a portion of his lands, his necessity was less, or, as expressed by counsel, if he owned more water than land, he might lawfully sell the excess of water, or lease it, or permit his co-tenants to use it, before any subsequent appropriation attached thereto; and of this junior appropriators may not complain.''

These Cache La Poudre cases which we have just cited decide the very proposition which we are now discussing: water-rights are property; they can be sold or leased, provided that the water is actually used, and so long as this is the case, outside parties have no right to complain.

Other cases to the same effect are the following (these cases are all quoted at length in appellant's brief in the case of *Salt River Vallcy Canal Co.* v. *Slosser*, No. 742.) : *Wyatt* v. *Larimer & Weld Irr. Co.*, 1 Colo. App. 480, 29 Pac. 906; *Nevada Ditch Co.* v. *Bennett*, 30 Or. 59, 60 Am. St. Rep. 777, 45 Pac. 472; *Oppenlander* v. *Left Hand Ditch Co.*, 18 Colo. 142, 31 Pac. 854.

SLOAN, J.—A rehearing was granted in this case at the last term of the court. As no opinion was filed upon the first hearing, we deem it proper to state now, with some fullness, the facts and our holding on these facts. The Maricopa Canal Company was organized under the general incorporation act of the territory during the year 1875. Its purpose, as expressed in its articles, was the carrying on and conducting of the business of supplying a portion of the Salt River Valley with water for irrigation, milling, manufacturing, and mechanical purposes. Its capital stock was divided into fifty

shares, each of which was treated by the incorporation as carrying with it a water-right privilege in the canal sufficient for the irrigation of one hundred and sixty acres of land. Prior to 1880 the canal company supplied water indiscriminately to landowners under its canal who applied for the same and paid the yearly rental therefor. In 1880 the canal company, by resolution, adopted the policy of giving preference to its shareholders and renters of the same in its yearly contracts for supplying water and of disposing of any surplus remaining to landowners who were neither shareholders nor renters of the same. After 1885 water was supplied by the company to such landowners as were owners of shares of stock and lessees of the same for particular years. Prior to 1887 no attempt was made by the company to confine the water-rights represented by the shares of stock to particular tracts of land. During that year a resolution of the company provided that the water-rights might be segregated from the shares of stock and attached to particular tracts of land. Some of the shareholders complied with this resolution, but many did not. It has been the practice of the shareholders to rent to non-shareholders, during particular seasons, their shares of stock or portions of the same, and to give orders to their lessees upon the canal company for the delivery to such lessees of the water assumed to be represented by said shares of stock. This practice was recognized by the canal company and these orders were respected by it as entitling the holders to the same rights accorded to the owners thereof. In some instances the owners of these shares of stock did not own or possess lands, and the only use made by them of the water-right privileges, assumed to belong to said shares of stock, was to rent them to non-shareholders who were the owners or possessors of lands. Gould, the appellant, is the owner of lands under the flow of the canal owned by the appellee, which are described as the ''north one half of the southwest one fourth, and the south one half of the northwest one fourth, of section fourteen, township one north, range three east, Maricopa County.'' The predecessors in interest of Gould began the irrigation of this land during the year 1869 by means of a ditch known as the ''Wilson Ditch.'' They continued to obtain water by this means until the purchase of the land by Gould in 1888. Gould until 1891 irrigated the

land from the same ditch. The Wilson Ditch was abandoned in 1891 for the reason that the water formerly available to it was being diverted by the Maricopa Canal and other canals having their heads farther up the river. After 1891 and until 1899, during each year, Gould obtained water in amounts ranging from sixty to seventy miner's inches, for the irrigation of his lands from the Maricopa Canal by renting shares of stock from others, in accordance with the prevailing practice. At the beginning of each irrigating season the canal company, in accordance with its general policy and as a condition upon which he could receive water, required Gould to sign a contract stipulating, in effect, that his use of water from the company's canal for such season should give him no right or claim to the use of water in the future; and that he waived thereby any and all right or claim which he might have by virtue of any statute, custom, or law to the use of water from the canal after the expiration of the period of time limited by the contract. In 1899 Gould applied to the Maricopa Canal Company for water for the ensuing irrigating season to the amount of eighty miner's inches, and tendered for said amount the fixed charge established by the company for its service for said season. The canal company declined to furnish him water upon the ground that he was not the owner of a share of stock or water-right in the canal, or had not rented a share of stock or water-right from any owner thereof for the season for which he applied. Thereupon Gould brought suit against the company for the purpose of compelling the canal company to furnish the water for which he applied.

Upon these facts the trial court found that Gould, at the time he made application for water and was refused, was not entitled to water or to the service of the canal company for the following reasons: That Gould was not an appropriator of water from the Salt River; that the Maricopa Canal Company was organized for the purpose of supplying water for irrigation purposes to its own stockholders, and that all the water diverted and carried by said canal company in its canal belonged to and was the property of such stockholders and holders of its water-right deeds; that Gould was not a shareholder in the company, or the lessee of any share of stock, or the owner of any water-right deed issued by the company. Upon

the grounds mentioned the trial court declined to grant Gould any relief, and dismissed his complaint.  The reasons that were given by the trial court for its action in dismissing the complaint present questions of vital importance to the appellee and other users of water in like situation.  These will be considered with other questions necessarily involved in the issues.

The first and most important question is as to the *status* of the Maricopa Canal Company as a carrier of water.  The finding of the court that the canal company, by its organization, limited its purpose and business to the supplying of water for irrigation to its own shareholders is not sustained by an inspection of its articles of incorporation nor by the history of the company.  The purpose of the corporation, as expressed in its articles, was "to carry on and conduct the business of supplying a portion of the valley lying upon the north side of Salt River, county of Maricopa, territory of Arizona, in the vicinity of the town of Phœnix, with water for irrigation and for milling, manufacturing, and mechanical purposes, and to this end and for this purpose to purchase, construct, build, or dig such canals, ditches, or flumes as may be necessary to convey water from Salt River, . . . and conveying said water to such point or points in the above-described valley of Salt River as may be necessary for the disposal or use of said water."  It will thus be seen that there is nothing in its articles of association which indicates that its purpose was to limit its service as a carrier of water to any particular lands, nor is it expressed that its purpose was to serve its shareholders, and not the public generally. Had the purpose of the company in its organization been to become a public agency as a carrier of water, such purpose might fairly and reasonably be inferred from the language used in the articles.  The history of the company shows that from the date of its organization until 1880 it supplied any and all landowners under the flow of its canal indiscriminately who applied for such service.  The organization of the company, therefor, and its early history do not sustain the holding that the company was organized for the sole purpose of serving its shareholders as the private agency of such shareholders.  It is true that the incorporators of the company as well as later shareholders regarded the ownership of a share of stock as carrying with it the right to have deliv-

ered, upon any lands the owner might designate from year to year, water sufficient for the irrigation of one hundred and sixty acres of land. It is also true that after 1880 and until 1885 the canal company distinguished between its shareholders and other consumers of water in fixing its rates of toll for its service. It also appears that subsequent to 1885 the company furnished water to its shareholders and to the lessees of shares of stock, whether appropriators or not, upon any land or lands which such shareholders or lessees of the same might designate, and declined to furnish water to persons not shareholders or the lessees of shares of stock, or the holders of so-called water-right deeds.

In the case of *Slosser* v. *Salt River Valley Canal Company,* 7 Ariz. 376, 65 Pac. 332, we held that a canal company having a similar organization, history, and relations to its consumers of water as shown in the case of the Maricopa Canal Company, was not a mere private agency having no other duty than the supplying by means of its canal water for particular appropriators whose agent it was, but occupied the *status* of a public agency, it having undertaken the diversion and carriage of water without regard to fixed contractual relations obligating it to perform such service for particular appropriators and limiting its service to the needs of such appropriators. We further found that as such agency such canal company does not possess the right to discriminate in rendering service as a carrier of water in any other way than the law in the first instance discriminates in recognizing the right of prior appropriation; that temporary leases or orders from shareholders, whether appropriators or not, conferred upon the holders no right entitling them, by virtue thereof, to water for use upon lands not owned or possessed by said shareholders; that the practice of the company recognizing such leases as valid was not in keeping with the spirit of our water laws, and was a clear violation of expressed provisions of our statutes, for the reasons that such canal company was not itself an appropriator of water, and that neither it, therefore, nor its shareholders as such possessed any power of control or any right of disposition over the water diverted and carried, save to transport and deliver the same to appropriators entitled to it under the law of prior appropriation; that water diverted from a public stream by such canal

company did not lose its character as public water, but remained public property until actually used by such appropriator. It was further found that the recognition by the company of "floating" water-rights, as they were termed, as incident to the ownership of shares of stock, and the practice of furnishing water to the lessees of such shares of stock for particular seasons, in effect was the same as though the canal company had supplied such lessees with water without the consent of its shareholders.

Applying these principles to this case, it follows that the Maricopa Canal Company from the time of its organization has been a public agency as a carrier of water. It also follows that, if the water it diverted and carried remained public property until actually used by appropriators, it was the subject of appropriation to the same extent and in the same manner as when it flowed in the channel of the Salt River. Under our statutes an appropriator of water for irrigation is one who makes an application of public water upon land he owns or possesses. To perfect such an appropriation two things are essential,—the ownership or possession of land, and the application thereon of public water to a beneficial use. No statute, either territorial or congressional, makes the ownership of the means of diversion essential to perfect the right of appropriation. Such means may be owned by another. Since, as stated in the Slosser case, a canal company organized for the purpose of the diversion and carriage of water for irrigation, and not being the owner of arable and irrigable land, is not an appropriator of water, it follows that the diversion of public water would be unlawful were the consumers of such water not appropriators in the fullest sense. When the canal company is not itself the appropriator, its only warrant for its diversion of water is that it supplies appropriators. All, therefore, whom it does supply and who make use of the water thus supplied for the irrigation of their lands are the appropriators whom, by its act of diversion and carriage, it undertakes to serve. It follows, therefore, that all persons owning lands under the flow of such a canal which have been irrigated by means of water furnished by such canal became appropriators, and possessed of rights of appropriation in the order of their priority. Had Gould, therefore, not been an appropriator before obtaining water

from the Maricopa Canal, he became such at the time he first obtained it from this source and applied it upon his land. Gould and his grantors have irrigated the land in question continuously since 1869. The circumstances under which Gould changed his mode of diversion by taking water from the Maricopa Canal instead of the Wilson Ditch cannot be held to have been an interruption of his original right of appropriation. We know of no provision of law by which a right of appropriation may be thus lost. It may be lost by abandonment, or it may be lost to another by adverse user on the part of the other, continued for the period of the statute of limitations, and in no other way. Abandonment is a matter of intent as such intent may be evidenced by the declaration of the party, or as may be fairly inferred from his acts. It cannot be fairly inferred that Gould, by abandoning the use of the ditch rendered useless as a carrier of water by reason of increased diversions from Salt River by older canals, including the Maricopa Canal, and by later diversions by newer canals, intended thereby to abandon his right of appropriation. Such an inference would be unjust to him, and not warranted by the facts.

The stipulation referred to in the statement of facts which Gould was required to sign as one of the conditions upon which he was permitted to obtain water from the canal is of no effect in lessening the liability of the canal company or the rights of Gould as an appropriator of water. As we have said, the water which the canal company diverted and carried was public property, and hence the canal company in its distribution could enforce only such rules and regulations as would be necessary and proper to secure economy of use, the rights of other appropriators, and its own right to collect a reasonable charge for its service. The law fixed and determined the extent and character of the appropriation made by each consumer of water, and the canal company possessed no power by contract to place any limitation upon such appropriation or to lessen its obligation in respect thereto. To recognize the binding force of the stipulation would be to concede to the company powers which it does not possess.

In the light of fuller discussion and a re-examination of the subject, we now hold, contrary to our holding in the Slosser case, that a canal company occupying relations to its

consumers of water like that of the Maricopa Canal Company may not arbitrarily discontinue its service in whole or in part. While such a canal company, in the nature of things, cannot be a common·carrier, as that term is used in law, it is yet a quasi-public servant. By an act of Congress approved July 26, 1866, canal companies were granted rights of way for the construction of canals over the public domain. They were also given the right of eminent domain by our territorial statutes. The granting of these privileges presupposes a public use. *Oury* v. *Goodwin*, 3 Ariz. 255, 26 Pac. 377. As a quasi-public servant, having received benefits from the public, such a canal company owes a duty to conduct its business as a carrier of water in such a way as may best promote the interests of the community, when this may be done without sacrifice of any of its rights of property. The community is interested in the permanent reclamation and improvement of lands. If a right of appropriation might be made of no use to its holder through the refusal of a canal company to divert and carry the water to which such holder is entitled, and which the canal company has theretofore diverted and carried, the holding of such right of appropriation by such a precarious tenure would not only impair its value to the holder, but would discourage the making of improvements and the putting of the land to which it is attached to its highest and best use. To the extent, therefore, that such a canal company has diverted and carried water from a public stream, and to the extent to which this water has been applied by appropriators for the necessary irrigation of their lands, the canal company must continue this service so long as such service is required by said appropriators ·and the water is available from the common source. Should the water not be available, of course the company cannot suffer any liability to its appropriators, for the measure of its duty is its ability to comply with the reasonable demands of appropriators.

In the case of the Maricopa Canal Company it appears that its practice has been at the beginning of each irrigating season to contract with such appropriators as may desire water for the ensuing irrigating season to supply such water in consideration of the payment of its charge for such service. It was argued in the brief of counsel for the canal company that if it be held that the canal company is obliged to furnish

VIII Ariz.—29

water to all landowners under the flow of its canal heretofore irrigated by it, whether shareholders or lessees of the same or not, the practical result would be that the canal company might be required to furnish more water than it is capable of delivering. This view of the relations of the canal company to such landowners is not to be inferred from the above holding. If applications for water be, made during any season in excess of the capacity of the canal to furnish it, the canal company would have the right, and indeed it would be its duty, to limit the contracts for the season to its capacity and to those appropriators possessing the older rights of appropriation. In making its contracts for such service it can easily guard against incurring liability to appropriators by reason of the amount of water available from the Salt River being insufficient to supply their needs.

Upon the authority of the Slosser case, as modified in this decision, the judgment of the court below will be reversed, and a decree will be entered in this court establishing appellant's rights as an appropriator of water to the extent needed for the irrigation of his lands, and requiring the appellee to deliver water to an amount not exceeding seventy miner's inches, being the maximum amount heretofore used by him for said purpose, upon the payment by appellant of such reasonable charge as may be established by appellee for its service and a compliance by appellant with the reasonable rules and regulations which may be established by said company in other respects; and that said canal company be required to continue to render said service under said conditions so long as it may possess the ability so to do without injury to the rights of other appropriators having prior rights of appropriation.

Kent, C. J., Doan, J., and Davis, J., concur.